In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-3619

JASON R. MUCHA,

*Plaintiff-Appellee,*

*v.*

JUTIKI JACKSON, *et al.*,

*Defendants-Appellants.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:14-cv-00303-LA — **Lynn Adelman**, *Judge.*

ARGUED APRIL 22, 2015 — DECIDED MAY 27, 2015

Before POSNER and KANNE, *Circuit Judges*, and DARRAH, *District Judge.*[*]

POSNER, *Circuit Judge.* The plaintiff charged two Milwaukee police officers (a captain and a lieutenant) with having detained him without a warrant or other justification, in violation of the Fourth Amendment as made applicable to state

_____

[*] Hon. John W. Darrah of the Northern District of Illinois, sitting by designation.

action by interpretation of the Fourteenth Amendment and in turn to acts of individual state officers by 42 U.S.C. § 1983. There are other defendants and other charges, but the only issue presented by this appeal is whether the officers are entitled to qualified immunity.

The plaintiff was a Milwaukee police sergeant. In October 2012, having not reported to duty for seven months as a result of stress related to his police work, he was examined by a psychiatrist at the behest of the Milwaukee Employees' Retirement System. The psychiatrist submitted his report of the examination to the Director of the Retirement System on November 5. On November 20 the Director forwarded a redacted version of the report to the Milwaukee Police Department (the reason for the delay is unexplained). The redacted version quoted the plaintiff as saying "I have had thoughts of suicide. I have had thoughts of suicide by cop. I don't want to kill myself. … I think of going to a command staff meeting with a rifle, shooting them until they shoot me. … I am not intending to do that. … I just can't go back [to work]. I can't take a chance of them trying to get me. It could have a real bad ending. … [I would] kill myself or them." He added that he had "over ten guns," including "twenty two rifles" (presumably he meant several .22 caliber rifles, not 22 rifles) as well as several pistols. The psychiatrist stated that "Jason Mucha is, in a not very veiled manner, threatening to shoot people in police command. He has a considerable stash of firearms. Hearing this, I cannot send him back to work. This is a public safety issue."

The police department received the report shortly before 5 p.m. on the 20th, and that evening the two defendant officers, accompanied by members of the police department's

Tactical Enforcement Unit (another name for a SWAT team), drove to Mucha's home and interviewed him. He told them that he had "dreams" or "thoughts of suicide and hurting other people" but did not have "any intent on [*sic*] hurting himself or anyone else." The officers decided to detain him (we don't know whether it was their own independent decision or they were acting under orders). They handcuffed him and drove him to the Milwaukee County Mental Health Facility, arriving at 8:40 p.m. They signed a form which stated that Mucha "evidences behavior which constitutes a substantial probability of physical harm to self or to others," the evidence consisting of "specific and recent dangerous acts, attempts, threats or omissions by the subject as observed by me or reliably reported to me." The treatment director at the facility stated that Mucha was being detained because he suffers from a mental illness called "Adjustment disorder with disturbance of conduct and mood" and that this diagnosis had led the director "to conclude [that Mucha] … poses a threat of danger to self or others" and to recommend "that involuntary commitment be initiated to secure treatment for the subject."

Mucha was released from the facility three days later—with what conditions, medications, and consequences we have not been told. Adjustment disorder—a reaction to stress—often is transient, although Mucha had been experiencing it for months. See generally Mayo Clinic, "Adjustment Disorders," www.mayoclinic.org/diseases-conditions/ adjustment-disorders/basics/symptoms/con-20031704 (visited May 26, 2015). It is not argued that the defendant officers knew anything about adjustment disorder or were told about it when dispatched to Mucha's house on the strength of the psychiatrist's report.

The officers had not obtained an arrest warrant when they handcuffed Mucha and took him to the mental health facility, and we'll assume that they can be deemed to be responsible or at least partly responsible for his three-day detention in the facility. They rely for their defense of qualified immunity on Wisconsin's emergency detention statute, Wis. Stat. § 51.15, which authorizes police officers to take a person to an appropriate mental health facility—without the formality of a warrant, and without having to have observed the person engaged in criminal conduct—if they have "cause to believe" that the person is "mentally ill" and has demonstrated "a substantial probability of physical harm to himself or herself as manifested by evidence of recent threats of or attempts at suicide or serious bodily harm," or that he's demonstrated "a substantial probability of physical harm to other persons as manifested by evidence of recent homicidal or other violent behavior on his or her part, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm on his or her part."

A state law cannot preempt the Fourth Amendment, but it can establish a standard of conduct that is consistent with the amendment but particularized to a specific situation; for the amendment itself is extremely terse (only 54 words in length).

Mucha argues that the defendant officers didn't have probable cause to believe that he was mentally ill and posed a danger to himself and to other police officers. The district judge agreed, but we are not persuaded by his reasoning. Mucha was a police officer, so obviously knew how to kill

people with guns, which he owned in abundance. He had told a psychiatrist that he was thinking of killing himself and/or a number of fellow police officers. True, that was on October 17 (or, as far as the officers knew, November 5, the date on the report), and the police department was not notified of his frightening interview with the psychiatrist until November 20 and he hadn't killed himself or anyone else in the interim. But the psychiatrist had understood Mucha to have "threaten[ed] to shoot people in police command," and the fact that a month had passed without the threatened mayhem occurring did not prove that he had recovered from the mental illness that had precipitated his threatening statements to the psychiatrist. The treatment director of the mental health facility to which the police took Mucha thought he should be committed. It would have been beyond irresponsible for the police to respond to Mucha's remarks to them at his home by saying: "So you've dropped the idea of killing yourself and other police? Great, you're fine, goodbye."

A police officer is not liable for damages caused by his official acts unless the unlawfulness of the acts is clearly established in law. The district judge thought this test for liability satisfied by a variety of facts, or supposed facts. One true fact on which he relied was that the police department had received the redacted copy of the psychiatrist's report 15 days after the report had been written. The judge thought that this was not "recent" within the meaning of the statute, which requires that the police act on the basis of recent threats, attempts, and so forth. The statute does not define "recent," however, and if one thinks for a moment about how the word is used it becomes obvious that it is situation specific. If you say you had a headache recently you're prob-

ably referring to something that happened hours or at most days ago, but if you say that Senator Cruz recently announced that he is seeking the Republican nomination for President in 2016 you may be referring to an event that took place weeks or months earlier. We can assume that had Mucha told the psychiatrist that as a teenager he had dreamed of shooting people the dream would not have been recent enough to justify invoking the Wisconsin emergency detention statute. But the fact that he had told the psychiatrist a month before the police acted that he was *currently* thinking about suicide and homicide (and indeed about both conjoined) made the dangerous thoughts still "recent" on November 20—or at least it cannot be said that their not being recent was "clearly established."

We also don't understand the judge's further determination that Mucha's acting "rationally" when the police interviewed him showed that all his bad thoughts had passed into history. As he did not want to be carted off to a mental health facility, he would not have wanted to tell the police what he had told the psychiatrist in what he may have believed to be confidence. Most people planning murder do not prate about it to the police.

The judge also thought that Mucha had never made "threats." A person to whom you say "I am thinking of killing you but I haven't made up my mind yet" will feel threatened. Remember that the psychiatrist who examined him said that Mucha had been "*threatening* to shoot people" (our emphasis).

Of suicide by cop (as by pointing a gun at a police officer to provoke him into shooting you in self-defense) we have had many examples in this violence-prone, gun-ridden

country, and likewise many examples of mass murders culminating in the murderer's suicide. A physician at the medical facility to which Mucha was taken decided he wasn't going to kill himself or others. But this happy outcome, if it is happy, can't be projected back to November 20. All that the police knew then was that the psychiatrist who had examined Mucha in October had understood him to have been making a threat, that someone from the Employees' Retirement System had reported the threat to the police department, and what Mucha had told them when they interviewed him. These danger signals triggered the emergency detention statute, and so the defendant officers when they seized Mucha and took him to the mental health facility were complying with a statute the validity of which is not contested. They were not violating any clearly established law, whether constitutional or statutory, federal or state.

We need not decide whether, in the absence of the state statute, the police would still have been deemed "reasonable" in their treatment of Mucha, which is the key term in the Fourth Amendment itself. But we imagine that they would have been.

The judgment is reversed with instructions to dismiss the two officer defendants from the case.