In the

# United States Court of Appeals
### For the Seventh Circuit

———————————

No. 19-1223

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CARLEOUS CLAY,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 15-CR-00576(1) — **Virginia M. Kendall**, *Judge*.

———————————

ARGUED NOVEMBER 14, 2019 — DECIDED NOVEMBER 25, 2019

———————————

Before MANION, KANNE, and SYKES, *Circuit Judges*.

PER CURIAM. Carleous Clay challenges his within-guide-
lines life sentence as unreasonable. He pled guilty to kidnap-
ping a woman, setting her afire, and leaving her to die. In a
plea agreement, he also admitted for sentencing purposes
that, while he was in pretrial detention in jail for those
charges, he held a case worker hostage and threatened to kill
her. Clay argues that he is entitled to a new sentencing hear-
ing because the district judge based his sentence solely on

aggravating factors and ignored his acceptance of responsibility. Because the district judge adequately justified the sentence based on the statutory sentencing factors, we affirm the judgment.

## I. BACKGROUND

The tragic events in this case began with a burglary. In September 2015, Clay broke into the home of his neighbor, Diane Pranske, while she was away at work. He left with some items but returned later that night to steal more. As he was ransacking the house the second time, Pranske returned. Demanding money, he threatened her with a hammer, abducted her, and drove her across state lines to two nearby banks, where he withdrew all he could from her account—$140. He brought her back to her house in search of more cash, but she had none.

Clay then shoved Pranske into the trunk of her car and drove for about 30 minutes until he reached a vacant parking lot. There, in the backseat of the car, he forced her to perform oral sex on him and vaginally raped her. After raping her, he tried to push Pranske back into the car's trunk. When she resisted, he strangled her until she passed out on the ground. Knowing that Pranske was still alive, Clay decided to kill her. He doused her with lighter fluid, set her afire, and left her in the parking lot to die. Incredibly, she survived by rolling on the ground to stop the flames and walking a half a mile to a fast-food restaurant to get lifesaving help. Clay was arrested a few days later.

Another harrowing episode soon followed. While in pretrial detention, Clay entered the office of one of the jail's case workers, Leticia Zamora Martinez, and pretended to

complain about another detainee. When Martinez reached for the phone to report the problem, Clay grabbed her arm, told her that he had a knife, threatened to kill her, and demanded her keys. Clay took her keys and proceeded to lock the office door. Martinez quickly radioed for help, and Clay responded by ordering her face down onto the floor. He straddled her back, grabbed her by the hair, and pressed a homemade knife against her throat.

Jail staff eventually unlocked the door and used pepper spray to subdue Clay. In his socks, they found four strips of cloth intended for restraining Martinez. They also recovered from Clay's pocket a note addressed to Martinez by name, in which he had written: "I'm getting life in prison anyway so I don't have anything to lose. Please don't try me. My intention is not to hurt you."

For his actions against Pranske, Clay pled guilty to kidnapping, 18 U.S.C. § 1201(a), attempted murder, *id.* § 1512(a)(1)(C), and using fire to commit another felony, *id.* § 844(h)(1). Additionally, for purposes of sentencing, he stipulated in a plea agreement to the conduct involving Martinez, which constituted kidnapping a federal employee, *id.* § 1201(a)(5). *See* U.S.S.G. § 1B1.2(c). The government promised in return to dismiss other charges pending against Clay, including those initiated in a separate case for his attack on Martinez.

The parties disputed whether Clay deserved a life sentence. In the presentence investigation report, a probation officer calculated a total offense level of 43 and a criminal history category of VI, yielding a Sentencing Guidelines range of life in prison. In its sentencing memorandum, the government asked for a life sentence, stressing the severity of Clay's

crimes and the danger he posed to the community. Clay requested a term of years that was not a de facto life sentence; he pointed to his acceptance of responsibility, his terrible childhood, and the statistical improbability that he would reoffend if he were to be released decades later at an advanced age. He also explained that he had taken Martinez hostage in an "attempt at suicide by police."[1]

At the sentencing hearing, the government expanded on its proffered reasons for a life sentence, beginning with the nature and circumstances of the offenses. After the prosecutor detailed the facts of the case, several persons made victim impact statements. Pranske recounted the immense suffering that Clay had inflicted on her. Her family discussed how the crimes had permanently changed her life, leaving lingering pain and depriving her of her independence. A physician who treated Pranske spoke about the severity of her injuries (30% of her skin was irrevocably damaged) and her prolonged hospitalization (she was in intensive care for 5 months and endured life-threatening infections and organ failures). Martinez and a colleague from the jail also addressed the court, describing the lasting psychological trauma that Clay had caused them.

To emphasize Clay's violent criminal history and "predatory" characteristics, the prosecutor highlighted one episode when Clay feigned asking a woman for directions to pull a

---

[1] "Suicide by police" loosely refers to a situation in which a person takes actions intended to "cause[] the police to retaliate in self-defense or defense of others by killing the person," such as by pointing a gun at an officer to provoke a violent response. Rahi Azizi, *When Individuals Seek Death at the Hands of the Police*, 41 GOLDEN GATE U. L. REV. 183, 188 (2011); *see also Mucha v. Jackson*, 786 F.3d 1064, 1067–68 (7th Cir. 2015).

gun on her and her children. The prosecutor also pointed out that Clay kidnapped and raped Pranske while on parole and receiving assistance with housing and employment. Finally, the government contended that a life sentence was necessary to provide just punishment and protect the public.

Clay then presented mitigating arguments targeting his culpability and ability to change. Defense counsel characterized him as a broken person, shaped by his horrible upbringing, to suggest that he was not inherently "evil." Counsel recounted that Clay joined a gang in the third grade; his older brothers have been involved in the criminal justice system; his mother struggled to support their family; and as a child he experienced abuse. Counsel also stressed that Clay showed remorse and deserved credit for pleading guilty, which showed that he took responsibility and was "facing the consequences of his actions … not hiding." Counsel asked for a sentence even just "one day" less than life. In allocution, Clay apologized to his victims, accepted that he had "made this bed" and had to "lay in it," and said that he was "thankful" that Pranske had survived. He also repeated that his attack on Martinez was really a suicide attempt.

The district judge sentenced Clay to life in prison and referenced the factors in 18 U.S.C. § 3553(a) when explaining its decision.[2] In terms of the offense's nature and seriousness, the judge stated that "the level of terror that [Clay] inflicted on these two women was just unimaginable." Clay's actions, the

---

[2] In addition to the life sentence for kidnapping, the district judge imposed a concurrent 30-year sentence for attempted murder, a statutory-minimum consecutive sentence of 10 years for using fire to commit another felony, and 5 years' supervised release.

judge said, created a "ripple effect of trauma and sadness and worry and fear" through the victims' family, friends, and coworkers. The district judge also recounted Clay's criminal history and remarked that it demonstrated escalating violence against women and manipulation of other people's good will. The judge further noted that Clay frequently tried to minimize his role in his crimes. Finally, the judge concluded that she saw in Clay only "recidivism" and "potential risk." She rejected his assertion that the attack on Martinez was a suicide attempt, for two reasons: because causing the guards to shoot him would not have required the use of a knife and ties; and because a psychiatrist who evaluated Clay's competency for trial had opined that Clay was "exaggerating" his "psychosis and suicidal symptoms in order to get better treatment."

## II. ANALYSIS

Clay argues that his life sentence is unreasonable because the district judge failed to address his acceptance of responsibility as a mitigating factor and instead based his sentence solely on the government's aggravating evidence. He urges that permanent or life-threatening injury, sexual exploitation, and physical restraint were all inherent in the charges and guidelines calculation. And he contends that, without considering Clay's choice to plead guilty knowing he faced an extreme punishment, the district judge's explanation did not justify a life sentence.

But the district judge at least implicitly—and thus adequately—considered Clay's acceptance of responsibility. *See United States v. Terronez*, 926 F.3d 390, 393 (7th Cir. 2019). In discussing Clay's criminal history, the judge observed a pattern of Clay minimizing his role in his crimes and

exaggerating symptoms of mental illness—both of which suggested disingenuousness rather than true accountability for his actions. If Clay earnestly wanted to accept responsibility, in the judge's view, he would not have tried to excuse the second attack by characterizing it as a suicide attempt. In any event, even if one disagrees with the sentence, it is clear in context why Clay's guilty plea did not move the district judge to deviate below the guidelines. *See id.* at 595–96. Nothing else showed that he deserved another chance, as he was on probation and receiving substantial social and financial support from his community when he attacked his neighbor. And from his long history of violence against women, one can infer that he would do similarly again. In other words, "anyone acquainted with the facts would have known without being told why the judge had not accepted the argument" Clay was asserting. *United States v. Castaldi*, 743 F.3d 589, 595 (7th Cir. 2014) (quoting *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005)).

The district judge also reasonably justified Clay's life sentence by focusing on several factors in 18 U.S.C. § 3553(a). We presume that a sentence falling within the properly calculated guidelines range—even a life sentence—is reasonable. *United States v. Taylor*, 907 F.3d 1046, 1051 (7th Cir. 2018). The district judge "need provide only a justification for its sentence adequate to allow for meaningful appellate review and to promote the perception of fair sentencing." *Id.* (quoting *United States v. Horton*, 770 F.3d 582, 585 (7th Cir. 2014) (per curiam)). Here, the judge discussed the gruesome and violent nature of Clay's crimes and the lasting damage it has caused his victims, who had not wronged him in any way. *See* 18 U.S.C. § 3553(a)(1). Reviewing Clay's criminal history, the judge concluded that Clay repeatedly showed a penchant for targeting

women by asking for help and then attacking them. *See id.* The likelihood Clay would recidivate was probably not going to decrease with age, the judge said, because Clay consistently engaged in violence and manipulation in and out of prison. *See id.* Finally, the district judge emphasized that sentencing Clay to life in prison was necessary to protect the public and to reflect the seriousness of, and provide just punishment for, his brutal crimes. *See id.* § 3553(a)(2)(A), (C).

### III. CONCLUSION

The district judge adequately considered Clay's acceptance of responsibility and provided a reasonable explanation for imposing a life sentence. We therefore AFFIRM the judgment.